J-S17019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| SHARON LYNN CORONA, | |
| Appellee | No. 661 WDA 2014 |

Appeal from the Order March 20, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0013881-2013

BEFORE:  GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 10, 2015**

The Commonwealth appeals from the trial court's order granting the motion filed by Appellee, Sharon Lynn Corona, to suppress evidence obtained following her interaction with police after she was approached by an officer while in her parked automobile.  We affirm.[1]

The suppression court summarized the factual background of this case as follows:

On July 3, 2013, Plum Borough Police Officer Daniel Moriarty was on routine patrol in uniform in a marked vehicle.  (T.T.)[1] at 4.

---

[*]  Former Justice specially assigned to the Superior Court.

[1] We note that on February 10, 2015, Appellee filed a motion to suspend consideration before the panel and *nunc pro tunc* request for extension of time to file her appellate brief.  Appellee filed her appellate brief on March 4, 2015.  Accordingly, said request is denied as moot.

Officer Moriarty was driving west on Saltzburg Road at approximately 2:30 a.m. when he noticed a car with its lights on parked in the parking lot of a local business. (T.T.) at 4 and 20. The car was completely off the road pulled off into that parking lot. (T.T.) at 12 and 20-21. The officer thought it had to be investigated because it was odd that a car was stopped at that location. (T.T.) at 5. Officer Moriarty passed the vehicle and then backed up his vehicle and put his window down to speak with the driver and ask what she was doing. (T.T.) at 4, 5. The driver, [Appellee], stated she was waiting for someone. (T.T.) at 5. Officer Moriarty noticed slurred speech on the driver and decided to have a conversation with her. (T.T.) at 6. Officer Moriarty does not recall which words were slurred in his very brief conversation with [Appellee] and based his observation of slurred speech on one sentence. (T.T.) at 23. Officer Moriarty did not observe [Appellee's] vehicle in operation, nor did he observe a motor vehicle code violation. (T.T.) at 24. At that point the Officer told [Appellee] to "hang on" and exited his vehicle to further investigate. (T.T.) at 6.

[1] T.T. refers to the Trial Transcript of March 20, 2014, followed by the page number.

After the Officer exited his vehicle[, Appellee] once again stated she was waiting for someone. (T.T.) at 7. The person she was waiting for drove by as they were speaking with each other. (T.T.) at 7. Officer Moriarty later noticed glassy eyes and an odor of alcohol on [Appellee's] breath. (T.T.) at 7. Shortly after that, a person did call [Appellee] on her cell phone and [the call] then came through on [Appellee's] Blue Tooth in her vehicle. (T.T.) at 8. After the phone call, Officer Moriarty asked [Appellee] to exit the car and perform field sobriety tests. (T.T.) at 9. After administering the field sobriety tests, the officer determined [Appellee] was intoxicated. (T.T.) at 12. Subsequently, he placed [Appellee] in handcuffs and under arrest. (T.T.) at 14.

Trial Court Opinion, 10/6/14, at 1-2.

On December 16, 2013, Appellee was charged with two counts of driving under the influence. On February 18, 2014, Appellee filed a motion to suppress. The trial court held a suppression hearing on March 20, 2014.

At the conclusion of the hearing, the trial court granted Appellee's motion to suppress. The Commonwealth then filed this timely appeal on April 21, 2014.[2, 3]

The Commonwealth presents the following issue for our review:

1. Whether the suppression court erred in finding that the police officer's actions and statements rendered the instant encounter a seizure that was not supported by either reasonable suspicion or probable cause?

Commonwealth's Brief at 7.

The Commonwealth argues that the trial court erred in granting Appellee's motion to suppress. The Commonwealth contends that the interaction between the police officer and Appellee was a mere encounter because he did not give any commands or take any action that would have indicated to a reasonable person that she was not free to leave. The Commonwealth posits that the encounter did not escalate into an investigatory detention until after the officer approached Appellee and

_____

[2] We note that the Commonwealth needed to file its appeal by Monday, April 21, 2014 because April 19, 2014 was a Saturday. *See* 1 Pa.C.S. § 1908 (stating that, for computations of time, whenever the last day of any such period shall fall on Saturday or Sunday, or a legal holiday, such day shall be omitted from the computation).

[3] The Commonwealth has certified, pursuant to Pennsylvania Rule of Appellate Procedure 311(d), the trial court's order prohibiting the introduction of evidence substantially handicaps the prosecution of this case. Commonwealth's Brief at 4. Therefore, pursuant to Pa.R.A.P. 311(d), this Court has jurisdiction to hear this appeal from the trial court's interlocutory order, even though the order did not terminate the prosecution.

observed the indicia of intoxication. Upon review of pertinent case law and the certified record, we disagree.

The standard of review an appellate court applies when considering an order granting a suppression motion is well established and has been summarized as follows:

> We begin by noting that where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.

Moreover, if the evidence when so viewed supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusions drawn from those findings.

*Commonwealth v. Lindblom*, 854 A.2d 604, 605 (Pa. Super. 2004) (citations omitted).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings. Only factual findings which are supported by the record are binding upon this court.

*Commonwealth v. Benton*, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citations omitted). In addition, questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Freidl*, 834 A.2d 638, 641 (Pa. Super. 2003).

Further, we are aware that Pennsylvania Rule of Criminal Procedure 581, which addresses the suppression of evidence provides, in relevant part, as follows:

> (H) The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

Pa.R.Crim.P. 581(H).

Both the United States and Pennsylvania Constitutions prohibit "unreasonable searches and seizures." U.S. Const. Amendment IV; Pennsylvania Const. Art. 1, § 8.

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." *Schneckloth v. Bustamonte*, 412 U.S. 218, 236, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *Commonwealth v. Blair*, 394 Pa. Super. 207, 575 A.2d 593, 596 (Pa. Super. 1990).

*Commonwealth v. By*, 812 A.2d 1250, 1254 (Pa. Super. 2002).

To secure the right of citizens to be free from intrusions by police, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as

those interactions become more intrusive. ***Commonwealth v. Beasley***, 761 A.2d 621, 624 (Pa. Super. 2000).

It is undisputed that:

[s]tate case law recognizes three categories of interaction between police officers and citizens, which include: (1) a mere encounter, or request for information, which need not be supported by any level of suspicion, but which carries no official compulsion to stop or to respond; (2) an investigative detention, which must be supported by reasonable suspicion as it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest; and (3) arrest or custodial detention, which must be supported by probable cause.

***Commonwealth v. Acosta***, 815 A.2d 1078, 1082 (Pa. Super. 2003) (*en banc*). Thus, as the first level of interaction between police and citizens, a mere encounter is itself a "request for information," which needs no level of suspicion. ***Id***.

As we explained in ***Commonwealth v. Jones***, 874 A.2d 108 (Pa. Super. 2005):

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.

***Id***. at 116 (quoting ***Commonwealth v. DeHart***, 745 A.2d 633, 636 (Pa. Super. 2000)).

If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. ***Commonwealth v. Boswell***, 721 A.2d 336, 340 (Pa. 1998). To effectuate an investigative

detention, the officers are required to have reasonable suspicion that unlawful activity was in progress. In order to demonstrate reasonable suspicion, the police must be able to point to specific facts and reasonable inferences drawn from those facts in light of the officer's experience. *Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999).

"Because the level of intrusion into a person's liberty may change during the course of the encounter, we must carefully scrutinize the record for any evidence of such changes." *Commonwealth v. Blair*, 860 A.2d 567, 572 (Pa. Super. 2004) (citing *Commonwealth v. Strickler*, 757 A.2d 884 (Pa. 2000)). In determining whether a mere encounter has risen to the level of an investigative detention, our inquiry focuses on whether the individual in question has been seized.

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in the view of all surrounding circumstances, a reasonable person would believe that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained.

*Strickler*, 757 A.2d at 889-890 (citations omitted).

In *Commonwealth v. Caban*, 60 A.3d 120 (Pa. Super. 2012), this Court addressed whether a police officer's direction to a driver to "hold tight" was indicative of an investigatory detention. In *Caban*, a state trooper cited a driver for speeding, returned her license and paperwork, and told her that she was free to leave. *Id*. at 128. When the driver began walking back to

her car, the officer asked her if she would answer a few more questions, which she did, before then saying she was ready to go. *Id*. The officer told her to "hold tight" while he questioned the passenger, who was Caban. *Id*. In determining that this conduct amounted to an investigatory detention, this Court offered the following analysis:

> Based upon this factual scenario, we conclude that Caban and [the driver] were subjected to an investigatory detention. To the extent that [the state trooper's] renewed questioning of [the driver] began as a mere encounter based upon the *Strickler* factors, when [the state trooper] told [the driver] to "hold tight" he unquestionably made clear to her that she was not free to leave the scene. As our Supreme Court emphasized in *Strickler*, the threshold issue in distinguishing between a mere encounter and an investigatory detention is whether a reasonable person would have believed that she was free to leave, and to this end the inquiry must focus on whether the police officer, either by physical force or show of authority, has restricted the defendant's movement in some way. *Strickler*, 563 Pa. [47,] 58-59, 757 A.2d at 889-[8]90. When [the state trooper] informed [the driver] to "hold tight," he restricted her movements and made clear that she was not free to leave the scene.

*Caban*, 60 A.3d at 128. Ultimately in *Caban* we determined that the facts adduced by the state trooper by the time he told the driver to "hold tight" provided the state trooper with sufficient reasonable suspicion to justify the investigatory detention. *Id*. at 128-129.

In the instant matter, the suppression court offered the following pertinent discussion:

> In the case at hand, Officer Moriarty passed a vehicle legally parked in a parking lot. The vehicle lights were on and the emergency flashers were not on. (T.T.) at 6. Officer Moriarty does not recall if he activated his lights or not when he

- 8 -

pulled off the road. (T.T) at 23. Further, he testified that he did not observe [Appellee] commit any moving or traffic violations. (T.T.) at 24. The officer testified that he pulled up alongside [Appellee] because it was suspicious in nature for a car to be parked at that location. (T.T.) at 25. In fact, on direct examination the Officer testified that [Appellee] was pulled over on the side of the road and that it was "odd for a vehicle to be where it was" and that it definitely needed to be looked into. (T.T.) at 5. The Officer later acknowledged that [Appellee] was parked in a parking lot. (T.T.) at 12-13. He further testified that his stop was investigatory in nature. (T.T.) at 26.

* * *

In this case, [Appellee] was legally parked in a parking lot. There was no indication that she was in any distress. The officer testified that his intention was to investigate due to the suspicious nature of a car being parked in that location[2]. The officer never testified that he was doing any kind of welfare check, just that he was suspicious. Asked what she was doing, [Appellee] stated that she was waiting for someone. In that brief sentence the Officer stated that [Appellee's] speech was slurred but could not recall which words were slurred. At that point Officer Moriarity then told [Appellee] to "hang on" and decided to exit his vehicle to investigate. At that point no reasonable person would believe that they were free to leave. After assessing the evidence based on the totality of the circumstances, the Motion to Suppress, and the credibility of witnesses[,] I found that the Officer lacked reasonable suspicion to detain [Appellee] to further investigate.

> [2] In the Affidavit of Probable Cause the Officer stated that [Appellee's] vehicle was pulled over to the right side of the roadway on the berm.

Trial Court Opinion, 10/6/14, at 5-7.

Our review of the certified record reflects that at the suppression hearing, Officer Moriarty testified and described what transpired in this manner:

I was driving on Saltzburg Road. I was heading in a west direction when I came across a vehicle. It was off onto the right side of the roadway. The lights were on.

I didn't know why the vehicle was stopped at that time of night, so I pulled off, next to the vehicle.

\* \* \*

Actually, as I think it went – I think I may have went past that vehicle and I kind of noticed it, then I stopped and I backed up to the vehicle. I put my window down. [Appellee] put her window down.

We had a conversation. I asked her if there was something wrong and why she was sitting there.

N.T., 3/20/14, at 4-5. Officer Moriarty explained that Appellee's vehicle lights were on, but her emergency flashers were not on. *Id*. at 6. Officer Moriarty then offered the following testimony:

Q. You asked her was everything okay?

A. I did.

Q. What, if anything, did [Appellee] say to you?

A. She told me that she was waiting for somebody.

*Id*. at 6. Officer Moriarty then indicated that, due to a slur in Appellee's speech, he thought it necessary to further investigate. *Id*. at 6-7. He also offered the following testimony:

Q. So you backed up, and put yourself in a safe place. And what happened after that?

A. Then I got out of the vehicle. **I told her to hang on. I got out of the vehicle, then I had a conversation with her.**

*Id*. at 6 (emphasis added).

- 10 -

Upon review of the certified record, we are constrained to conclude that although Officer Moriarty's initial interaction with Appellee when he pulled up along the side of her vehicle was a mere encounter, the incident then escalated into an investigatory detention. Indeed, when Officer Moriarty told Appellee to "hang on," parked his police vehicle, and then got out to talk with Appellee, he unquestionably made clear to her that she was not free to leave the scene. *Caban*, at 128. Hence, the officer subjected Appellee to an investigatory detention at that point.

In order to justify the stop of Appellee, we reiterate that Officer Moriarty was required to have reasonable suspicion that unlawful activity was in progress at the time of the investigatory detention. To demonstrate reasonable suspicion, the police must be able to point to specific facts and reasonable inferences drawn from those facts in light of the officer's experience. *Cook*, 735 A.2d at 677.

During cross-examination, Officer Moriarty offered the following relevant testimony concerning the incident:

Q. And you came upon a car that was not in motion; correct?

A. That's correct.

* * *

Q. So it was in a parked position, in – you described it as a business. Do you recall what type of business it was?

A. I don't know. I see that place all the time, I have no idea what that is.

- 11 -

* * *

Q.  Where you positioned your vehicle you said you pulled up kind-of past it; right, then backed up?

A.  Yes.

* * *

Q.  You said that you rolled down your window; correct?

A.  That is correct.

Q.  Did you roll down your window first or did she roll down her window?

A.  No idea.

Q.  And there was a very brief conversation.  In fact, you asked is everything okay; right?

A.  That is correct.

Q.  And her answer was yes, I am waiting for someone?

A.  Basically, yes.

Q.  So in that period of time you say that you noticed slurred speech?

A.  That is correct.

Q.  **What exactly was it about the speech, do you recall?  I mean, those are very few words there?**

A.  **Like which letters were actually slurred?**

Q.  **Yes, do you recall what it was?**

A.  **I don't recall that.  No, it was slurred speech.  I don't recall which words.**

Q. **Based on basically one sentence you pulled your vehicle back, and you activated your emergency lights; right?**

A. **Well, I mean, that's what I did do.** I don't know if I activated emergency lights or not. I don't know that for a fact.

Q. But you called in a traffic stop?

A. I did, I called in.

N.T., 3/20/14, at 20-23 (emphasis added).

Although Officer Moriarty stated that Appellee's speech was slurred, there is no doubt that Appellee only spoke a few words to the officer. Indeed, upon questioning, Officer Moriarty admitted that he could not recall which of the few words or letters spoken by Appellee were actually slurred. In light of this testimony, we are constrained to agree with the trial court that Officer Moriarty failed to articulate specific observations necessary to establish reasonable suspicion to effectuate the investigatory detention of Appellee.

In summary, when Officer Moriarty told Appellee to "hang on" and then parked behind Appellee he subjected her to an investigatory detention. Furthermore, Officer Moriarty failed to articulate specific observations necessary to establish reasonable suspicion. Therefore, we agree with the trial court's determination that Appellee was subject to an investigatory detention and that the police officer lacked the requisite reasonable suspicion to effectuate the stop. Accordingly, we affirm the order of the trial court granting Appellee's motion to suppress.

Order affirmed.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/10/2015